O’Hara, J.
There being no substantial dispute as to the allegations of the amended petition, the real questions in the case arose upon the offer of its proof by the defendant in the court, of common pleas.
The answer of defendant denied that there was anything whatever due the plaintiff as royalty. It was drawn carefully and with much detail, but *165 in substance alleged that the lease contemplated .that the coal should be mined and removed by the customary methods and in the manner usually employed in the Hocking Valley district; that those methods were employed and that manner followed by the defendant, and it had accordingly mined and removed all the coal that could possibly be mined and removed under such conditions; and that it had fully paid plaintiff for all the coal so mined and removed. It further alleged that the roof or top above the coal vein in said premises is of such peculiar character and formation that it falls as soon as the coal is removed, and that it is impossible to support or hold it up by any known means, whereby it is dangerous for miners, and therefore none can be obtained to work in the mine. It further alleged that because of such dangerous condition of the mine, the miners refused to work therein, before, during and since the period mentioned in the amended petition, and that during such period the miners struck and thereafter continued to strike against working in such dangerous territory. And the defendant finally alleged that the causes and conditions aforesaid, which prevented it from mining and removing from said premises the minimum tonnage provided for in said lease and rendered the same impossible, were beyond its control, and came within the meaning and terms of the saving clause hereinbefore referred to, which reads as follows: “It is hereby understood and agreed by and between the parties hereto, that in case and so long as it shall be impossible to mine and remove said amount by reason *166 of strikes, lockouts, fires, floods or any other cause beyond the control of the second party, lack of transportation facilities excepted, the said minimum shall not apply.”
At the close of plaintiff’s evidence, the common pleas court held that the burden of proof was upon the defendant to show that it was prevented from mining and removing- the minimum tonnage by causes beyond its control as aforesaid, and we agree with the court in-that regard.
The defendant then undertook to offer evidence in support of the allegations in its answer, tending to show the tonnage capacity and physical condition of the different parts of the mine in question; the unmined areas in certain portions of the property; the objection and refusal of the miners to work in a certain part of the mine and the reasons for such refusal; the inability of defendant to mine coal from that part of the mine because of its physical condition; and the means employed and expense incurred by defendant in an effort to explore and mine the coal and to produce the minimum tonnage.
The court refused to allow the introduction of any of this evidence, on the ground that it did not' tend to prove any cause beyond the control of the defendant, within the meaning of the saving clause, which would relieve it from liability to pay for the agreed minimum tonnage.
The defendant saved its rights by making numerous offers of proof in the above particulars, and the correctness of the rulings in those regards *167 is thus presented for review. As there was no material evidence on behalf of defendant left for submission to the jury, the court directed a verdict for plaintiff, upon which it subsequently entered judgment.
In support of its contention that the foregoing evidence was admissible, and tended to relieve it from liability for the unmined and unpaid balance of the required minimum tonnage, the defendant urged the following propositions, viz: that the covenant to mine and remove the minimum tonnage was not absolute; that the clause “or any other cause beyond the control” of the second party, should not be limited by the rules noscitur a sociis and ejusdem generis to either temporary causes interfering with the mining and removal of the coal, or to causes kindred to or of the same class as those specifically enumerated, but should be construed in its popular acceptation so as to embrace any other cause beyond the control of the second party, not attributable to its fault; that the word “impossible” as used in said contract does not mean absolute impossibility, but should be construed in a business sense; that accordingly the mining and removing of the minimum tonnage is “impossible,” when it appears that on account of causes and natural disturbances or conditions not attributable to the fault of the second party, it cannot be mined and removed without resorting to unreasonable or extraordinary expense, or the employment of unusual or extraordinary means; and that the retention of possession by defendant under the above *168 Conditions, without mining and removing the minimum tonnage, was not sufficient to render it liable for the minimum royalty.
On proceedings in error, the circuit court sustained the claims made by the defendant as above set out, and held that the evidence offered should have been admitted, and that the question of the impossibility of mining and removing the minimum tonnage under the saving clause of the lease as presented by such evidence, was one of fact that should have been submitted to the jury. Accordingly the judgment of the common pleas court was reversed and the cause remanded for a new trial, and this action of the circuit court is the ground of complaint here.
The lease under consideration was entered into between parties engaged in the coalmining business, and covered property in an established and well-known mining district. At the time of its original execution, there had not been any development of the particular property covered by the lease, but the lessee was satisfied to accept the right and privilege to enter upon and search and explore for coal, and to dig, mine and remove the same, for which he agreed to pay a minimum royalty of three thousand dollars for the first year, and an annual royalty of not less than six thousand dollars thereafter until all the coal should be removed.
The lease is drawn with great care and particularity, and it is evident that the parties intended everything to be clear and plain, and to leave little or nothing to inference or conjecture. This is *169 apparent from the clauses as to royalty and tonnage; the'particular requirement that the lease was to continue “until all the coal in, upon or under said lands has been fully and entirely removed therefrom, including all pillars, supports and stumps, which shall be all withdrawn and taken out;” the detailed provisions as to the ownership and care of the improvements upon the property made by the lessee; and various other provisions preserving the rights of both parties.
That the original lessee was justified in accepting this lease, with all its requirements, is shown by the fact that he and the company which succeeded him entered upon the property and conducted mining operations so successfully and with such good results, that the defendant, The New Pittsburgh Coal Co., was willing to accept an assignment of the lease, with all its terms and conditions and without any modification, six years after it had been executed and the mines had been in •operation.
This fact, taken in connection with the fact that the defendant is a corporation formed for the purpose of and engaged in the business of mining for coal, and therefore presumably familiar with mining property and leases and well advised in that regard, is important when we come to consider the claims made and defenses set up by it against the enforcement of the terms of the lease. Especially is this true, when we remember that it operated under the lease for a period of more than two years, before any question .was raised or default occurred in the payment of royalty. ,
*170 When sifted down, all the claims and defenses made by the defendant are founded upon the physical condition or’ geological formation of a portion of the mine in controversy.
The property under lease consists of about two hundred and forty acres in the form of an L, and the coal is divided and located in two well-defined hills, separated by a ravine running north and south, throwing the long side of the L upon the west side of the ravine and forming what is known as the “west hill.” The “east hill” is divided into two parts by a large' clay vein, which cuts through the coal in the hill at a sharp angle, and these are known as the “east part of the east hill,” which is a relatively small part of the mine, and the “west part of the east hill,” which is considerably larger.
The geological formation in the “west hill” and the “east part of the east hill” are favorable for mining, and, as admitted by defendant, practically all the coal has been mined and removed from these two parts of the mine.
But it is claimed that the coal in the “west part of the east hill” is unminable, owing to the dangerous and abnormal condition of the roof or top covering the coal. This roof is said to be neither a regular shale, nor what miners call soapstone, but simply a great mass of mud or clay, of undetermined thickness, and not cemented together, as in the case of shales. Although the roof appears strong enough when the coal is in position, nevertheless by reason of its condition as above described, and its being further weakened by *171 numerous cracks, joints, seams and slickensides existing in every part, whenever the coal has been mined out the roof will fall in pieces of irregular shape, varying in weight from a few pounds to several tons.
By reason of the foregoing, the defendant claimed and offered to prove that the mining of coal in that part of the mine was so dangerous to life and limb, that for a long while it was difficult to obtain miners who were willing to undertake to mine and remove the coal; and finally that it was considered not only dangerous and impracticable, but actually became impossible to remove the coal in the west part of'the east hill by any known system of mining.
Notwithstanding the unminable condition of the coal in this part of the mine, and the fact that the defendant claimed to have removed practically all the coal from the other parts, it maintained its right to retain possession of the demised premises,, without paying the minimum tonnage royalty reserved in the lease, but paying a royalty only upon the nominal tonnage that it might be able to mine and remove from time to time.
As already indicated, the defendant based this contention upon its construction of the saving clause in the lease, viz, that the conditions above set out rendered it impossible to mine and remove the required tonnage by reason of “causes beyond its control,” and therefore the minimum royalty did not apply.
In order to arrive at the proper construction of this clause, the learned counsel for both parties *172 have exhibited great industry and research, and have gathered and submitted a vast number of authorities bearing upon the questions involved.
It would extend this opinion to an unreasonable length, however, to undertake to analyze or even briefly refer to them, and as they will be found in the Reporter’s note, it would serve no good purpose to discuss them here.
It appears to be well settled that where a minimum royalty, sometimes called dead rent, is reserved without exception, and the lessee continues to hold possession of the demised property, he is bound to pay the same. Whether the defendant might have abandoned the premises when the coal was so far removed as to be incapable of further practical operation, and whether this would have relieved it of obligation to pay the minimum royalty, are questions that do not arise in this case.
We therefore now come to a consideration of the claim that the condition of the roof of the mine in the west part of the east hill made it impossible to mine and remove the minimum tonnage, and that this was a cause beyond the control of the defendant within the meaning of the saving clause in the lease.
It clearly appears in the record from the proof offered by the defendant, that this condition of the roof in that part of the mine was well known very early in the history of this lease, and some time before defendant took its assignment thereof.
The miners would frequently refuse to work there from the very earliest days, and the lessee was continually putting new men into the mine, *173 who remained hardly long enough to become acquainted with each other, so that the miners named that part the “Strangers’ Home.” It was also known among the miners as “Bad Lands,” because of the great and unusual dangers encountered in mining and removing the coal. In the year 1899, at one time, the chief inspector of the state mining department ordered the work stopped in that part of the mine because of its dangerous condition, and in 1905 the state mining department requested the defendant not to put men at work there. Finally the miners refused to do any work at all in that part of the mine, and it was closed entirely and has remained closed ever since.
Nevertheless considerable work had been done in the east hill, and in the particular territory of which defendant now complains, and a very substantial quantity of coal had been mined and removed therefrom prior to the assignment of the lease to defendant. This more particularly appears from a map offered in evidence by the defendant, showing the property and the mining operations that had been conducted thereon, with the progress made from time to time. The physical conditions were therefore open to inspection, and apparent to any person interested, especially to one familiar with mines and mining operations.
We thus see that when defendant obtained its assignment of the lease in May, 1900, it found the very condition in existence which it undertook to set up some years later as a “cause beyond its control,” within the meaning of the saving clause.
*174 This brings us to a consideration of that clause, and of the meaning of the phrase “or any other cause beyond the control of the second party,” as therein used.
We have already indicated the contention of defendant that this clause should not be limited to temporary causes or those similar to the ones specifically mentioned, by the rules noscitur a sociis and ejusdem generis, but that it includes a condition of affairs such as defendant claims to have existed and to now exist.
The clause itself, however, clearly shows that temporary conditions only were in the minds of the parties, as indicated by the use of the words "in case and so long as it shall be impossible to mine and remove,” etc. Then follow certain specified causes which shall suspend the operation of the minimum royalty, viz, strikes, lockouts, fires and floods, none of which can be fairly said to have been considered by the parties as permanent obstacles to the operation of the mine. This would seem to be emphasized by the exception to “other causes beyond the control of the second party,” viz, “lack of transportation facilities,” which would not relieve the lessee, and could hardly have been considered by the parties as a matter of permanent disability.
The rule ejusdem generis is a well known rule of construction, and has been frequently recognized and applied in this state and elsewhere. While not conclusive under all circumstances, nor applied when it would violate the clear intention of parties as expressed in their written agreements, *175 nevertheless it is of value whenever tnere would be no such violation, and this is a case where the rule seems to be plainly applicable.
Furthermore, the conditions which the parties; evidently had in mind that would excuse the lessee from the payment of the minimum royalty, were undoubtedly such as might arise in the future, and render it impossible for him to carry out his agreement. The very nature and character of those enumerated would seem to make that plain and negative the idea that the physical condition or geological formation of the property, which was necessarily in existence at the date of the lease and would of course be permanent, was also to be included among these temporary suspensions c.: the lessee’s liability.
Should the contention of the defendant be adopted, it will practically have an unlimited lease, and be able to keep plaintiff out of the property as long as it pleases, without plaintiff receiving any compensation. As the lease provides that lessee shall have the premises “until all the coal has been removed,” and there is admittedly coal in the east hill, practically all the coal having been mined and removed from the other parts, the defendant would be able to hold the property indefinitely without payment of rent, by reason of its claim that the remaining coal cannot be mined and removed through causes beyond its control. Such a condition of affairs was certainly not within the contemplation of the parties, and should not receive the sanction or approval of any court.
*176 The position taken by defendant and sustained by the circuit court, would also be contrary to the plain intention of the parties to the lease to avoid all ground or opportunity of dispute. If the payment of the minimum royalty should be made to depend upon the various standards of what would be reasonable effort on the part of lessee to mine the coal, or unreasonable expense in that regard, or whether or not it was following the usual and customary method of mining in vogue in the Hocking Valley, or other similar debatable' conditions, it would open the door to frequent and expensive controversies. This otherwise plain and simple provision would then amount to nothing, but would become a source of endless trouble and litigation.
It is quite usual to expressly provide in mining leases that the lessee shall not be required to pay the minimum royalty, where the physical condition of the mine or the reduction in the coal deposits would prevent mining the required tonnage; that certain allowances should be made if the mining became .too expensive; that excess payments under minimum royalty clauses should be applied towards surplus of coal thereafter mined; and for other similar contingencies. But it has been heretofore held by this court, that the failure to include such provisions in a contract was clear • indication that a different purpose was intended, and that such .material stipulations should not be supplied by construction and a new contract thus made for the parties.
The specified causes in the clause in question, viz, strikes, lockouts, fires, floods and lack of *177 transportation facilities, are well understood and have well-defined meanings. So that if the lessee desired to include other matters, particularly such as are contended for here, he should have taken the precaution to have them particularly mentioned in the contract, otherwise he will be held to have waived them.
It might also fairly be said that to allow the claim of defendant as to the construction of this lease, would lead to the result that the lessee was bound to operate the mine according to the terms of the lease only so long as it was profitable to do so; or in other words, that he was at liberty to select that part of his contract or perform that part of the work which was profitable, and refuse to abide by the other parts of the contract or perform other parts of the work whenever the same might become unprofitable. This is clearly against all principles of reason and law, and the well-settled rules governing the construction of contracts.
The considerations already expressed apply with equal force to the construction of the word “impossible,” as claimed by defendant and heretofore indicated, and which met with the approval of the circuit court.
Besides, the occasion for such' construction could only arise in connection with some cause included within the meaning of the saving clause. As the defendant has not presented any such cause, the question becomes an abstract one, and does not require further attention.
The same answer may well be made to the claim of defendant, so strongly urged, that mining opera *178 tions under the lease were to be carried on according to the usual and customary method of mining in the Hocking Valley district, and that so long as defendant pursued such method, it would be relieved from the obligations of the minimum royalty clause if less than the required tonnage of coal were produced-in that way.
If, as set out in its answer and claimed in argument, both parties were familiar with such custom and must have had it in mind when they made the lease, nevertheless in the face of that knowledge, the lessee saw fit to clearly and distinctly bind himself to mine and remove or pay for not less than a certain tonnage of coal, one of two situations confronts us. The lessee either intended and agreed to produce or pay for such tonnage by the use of the customary method, or by his neglect to protect himself by a proper provision in the contract in a matter of such importance, he must be deemed in the eyes of the law to have waived it, under the principles heretofore discussed. In view of all the circumstances, and taking into consideration the provisions and tenor of the lease itself, it would seem more natural and probable, however, that such provision was deliberately omitted, and that the minimum tonnage was intended and agreed to be produced by the use of the customary method.
The defendant also sets up the defense of a strike on the part of the miners employed in the mine, which it claimed made it impossible to mine and remove the minimum tonnage. Of course, such a cause clearly comes within the terms of the saving *179 clause and would constitute a good defense, if supported by the evidence.
But the record plainly shows that the only general strike as to the entire mine occurred on May 16, 1905, and that it lasted but one day. What the defendant really relies upon to sustain this defense, is the refusal of the miners to work in the west part of the east mine, where the defendant claims it is too dangerous to do any work, and where the coal cannot now be removed by any known process of mining. During the entire period in controversy covered by this action, however, the defendant was admittedly carrying on its mining operations in the other parts of the mine continuously, and removing substantial quantities of coal therefrom. We do not, therefore, consider this refusal of the miners to work, which was confined to the dangerous part of the mine only, as a “strike” within the meaning of the saving clause of the lease, nor do we think that it serves to relieve the defendant from its obligation to pay the minimum royalty.
It has been expressly brought to our attention by the defendant, that this case is of great importance to the parties, because other suits are now pending between them involving the same questions of law and fact which are involved here, and that no doubt additional cases will be brought from time to time for the recovery of the minimum royalty under the lease in controversy.
We mention this as one reason for the rather full statement of facts and the length of this opinion, but we also feel that it emphasizes the conclusion arrived at with reference to the result *180 that would obtain, should the contention of defendant be upheld. Notwithstanding the admitted fact, that practically all the coal had been mined and removed from the west hill and the east part of the east hill at the time of the trial in the common pleas court, and that the remaining coal in the west part of the east hill was then and now is absolutely - unminable by any known method of mining, thus covering the entire property in question, nevertheless it appears that the defendant still retains possession of the premises, and refuses not only to pay the minimum royalty, but will necessarily refuse to pay any royalty at all. This must be so, because it claims that it is only bound to pay for coal actually mined, and as there is no coal that can be mined, of course there will be no royalty.
We are thus confirmed in the views already expressed, and it would clearly seem that such a contention need only be stated -to be denied.
It follows from the foregoing considerations that the defendant did not set up a good defense to the claim of plaintiff for the balance of the royalty, and that the common pleas court was right in rejecting the evidence offered by the defendant and directing a verdict in favor of the plaintiff.
This requires a reversal of the judgment of the circuit court and an affirmance of that of the court of common pleas, and it will be so ordered.

Reversed.

Davis, C. J., Johnson and Donahue, JJ., concur. Si-iauck, J., not participating.